IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 2 4 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| NEW HOLLAND NORTH AMERICA, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION |
| VS. | § | |
| | § | NO. **B-01- 162** |
| ATLANTIC TRADING, INC. d/b/a | § | |
| TRACTOR-TEX and WILLIAM CURRAN, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff, **New Holland North America, Inc.** files its Original Complaint and Application for Temporary Restraining Order and Preliminary Injunction against Defendants Atlantic Trading, Inc. d/b/a Tractor-Tex and William Curran and shows the following:

1. This is an action for damages, preliminary and permanent injunctive relief, and declaratory relief under the Lanham Act, 15 U.S.C. §§ 1051, *et seq.*, TEX. BUS. & COMM. CODE § 16.29, and principles of state common law.

### I. PARTIES

2. Plaintiff New Holland North America, Inc., is and was at all times relevant hereto a Delaware Corporation with its principal place of business in New Holland, Pennsylvania.

3. Defendant Atlantic Trading, Inc. d/b/a Tractor-Tex is incorporated in the State of Texas and maintains its principal place of business any may be served with process at 4500 N. Expressway 83, Brownsville, Cameron County, Texas 78521.

49380:979822.1:082201

4.  Defendant William Curran is an individual and is the president of Defendant Atlantic Trading Inc. d/b/a Tractor-Tex.  He is a resident of the State of Texas any may be served with process at 4500 N. Expressway 83, Brownsville, Cameron County, Texas 78521.

## II. JURISDICTION & VENUE

5.  The Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. §§ 1121 and 1125, 28 U.S.C. §§ 1331, 1338 and 1367, and pursuant to the principles of pendent and ancillary jurisdiction.

6.  Venue is proper in the Brownsville Division of the Southern District of Texas pursuant to 28 U.S.C. § 1391(b) and (c).

## III. FACTS

7.  Plaintiff has legal rights to U.S. Trademark Registration Numbers or Application Numbers 75/756624, 642298, 889234, 623834, 646749, 890857, 820683 and 1152155 for the Leaf New Holland and New Holland trademarks, as applied to the selling and servicing of farm equipment.

8.  Plaintiff and its predecessors, since the early part of the last century, have engaged in the business of manufacturing and selling agricultural and industrial equipment and attachments therefor under the trademarks "Leaf New Holland" and "New Holland."  Plaintiff operates throughout the United States and in many foreign countries.  In North America alone, Plaintiff has over 1,300 independent dealers that are authorized to sell Plaintiff's products.

9.  The public has come to recognize and to identify the goods and services associated with the "Leaf New Holland" and "New Holland" trademarks as exclusively representing the source of such goods and services as being Plaintiff.

10.  On or about January 19, 1990, Plaintiff and Defendants entered into a written dealer agreement which authorized Defendants to become an authorized dealer to sell, lease, rent and service Plaintiff's products, which included tractors for farming and industrial use and agricultural equipment. *See* Exhibit "A."

11.  The written dealer agreement authorized Defendants to advertise, display signs and distribute sales literature emblazoned with Plaintiff's trademarks, trade names, logos, and designs. *See id.*

12.  All right, title and interest in the dealer agreement between Plaintiff and Defendants is the property of Plaintiff.

13.  The dealer agreement between Plaintiff and Defendants was terminated on or about April 30, 1999.

14.  Pursuant to paragraph 22 of the dealer agreement, Defendants, upon the date of termination, shall "remove all signs . . . which bear any trademark or trade name of Company . . . discontinue the use of stationery . . . and the like bearing any trademark of trade name of Company, and . . . cease to represent in any way that he is or was an authorized dealer . . . ." *See* Exhibit "A," at p. 8, ¶ 22.

15. Defendants have failed to comply with the provisions of paragraph 22 of the dealer agreement and have refused the several written demands of Plaintiff to comply with such provisions, as evidenced by correspondence comprising Exhibit "B," attached hereto, continuing up to the time of filing of this petition, to display signs bearing the trademarks or trade names of Plaintiff—that is, New Holland, Ford and the New Holland Leaf Logo—to advertise under the trade name of New

Holland, Ford and the New Holland Leaf Logo, and to otherwise represent to the public that Defendants are an authorized dealer of Plaintiff. *See* Exhibit C (photographs).

16. Defendants have engaged in the unauthorized offering for sale and the sale of their goods and services under the infringing mark and trade names willfully and with full knowledge that they have no right to use the foregoing.

17. Defendants have not complied with Plaintiff's written demands and, in fact, have refused to answer Plaintiff's letters or to engage in any communication.

18. Defendants have acted willfully and maliciously, have unlawfully attempted to trade on the tremendous commercial value, reputation and goodwill of Plaintiff's trademarks and trade names, and have deliberately and intentionally confused and deceived the public as to a continuing affiliation, connection or association of Defendants with Plaintiff and/or as to the origin, sponsorship or approval of Defendants. Defendants are unlikely to cease their unlawful behavior without intervention of this Court.

19. Defendants have been and are continuing to be unjustly enriched at the expense of Plaintiff by Defendants' unauthorized use of the infringing marks.

20. Unless the acts of Defendants are immediately and permanently restrained by this Court, they will continue causing irreparable injury to Plaintiff and to the public for which there is no adequate remedy at law.

21. Lastly, through the course of termination of Defendants' status as an authorized dealer of Plaintiff's products, Defendants owes Plaintiff the sum of $50,701.82. This sum remains due and owing to Plaintiff after applying all credits for return of certain inventory.

## V. CAUSES OF ACTION

## COUNT ONE

## BREACH OF CONTRACT

22. Plaintiff realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 21 above as if same were repeated verbatim herein.

23. Defendants' actions constitute an intentional breach of the written dealer agreement, which is a valid contract, resulting in, *inter alia*, lost profits to Plaintiff due to lost sales through currently authorized dealers and in damage to Plaintiff's valuable goodwill and reputation.

## COUNT TWO

## TORTIOUS INTERFERENCE WITH CONTRACT

24. Plaintiff realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 23 above as if same were repeated verbatim herein.

25. Defendants' conduct in refusing to remove signs bearing the name "New Holland" and "Ford" and in continuing advertising using the name of "New Holland" and "Ford" is undertaken with the express intent to interfere with the contractual relationships and obligations of Plaintiff to among others, its predecessor.

26. Defendants' conduct in continuing to hold itself out as a dealer in Plaintiff's products through advertisements and the use of signs bearing the trade name and designs of Plaintiff is undertaken with the express intent to interfere with the contractual obligations of Plaintiff to among others, its predecessor.

27. Defendants' conduct has interfered and will continue to interfere with the existing contractual relationships and the prospective economic advantage of Plaintiff.

49380:979822.1:082201                           -5-

28. As a direct and proximate result of Defendants' tortious interference with Plaintiff's contractual relationships, Plaintiff has suffered and will continue to suffer damage to its business, including, but not limited to, loss of accounts and profits and loss of goodwill and business reputation. As a result, Plaintiff has suffered and will continue to suffer immediate and irreparable harm, injury, and loss.

**COUNT THREE**

**TRADEMARK INFRINGEMENT UNDER THE LANHAM ACT**

29. Plaintiff realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 28 above as if same were repeated verbatim herein.

30. The acts of Defendants complained of herein constitute trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114(1).

31. In view of the blatant and willful nature of Defendants' infringement and unfair competition, this is an exceptional case within the meaning of 15 U.S.C. § 1117(a).

**COUNT FOUR**

**UNFAIR COMPETITION UNDER THE LANHAM ACT**

32. Plaintiff realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 31 above as if same were repeated verbatim herein.

33. Defendants' actions constitute false representations and false designations of origin that are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of Defendants with Plaintiff, or as to the origin, sponsorship or approval of Defendants' goods, services or commercial activities by Plaintiff. Such action constitutes unfair competition and false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

## COUNT FIVE

## COMMON LAW UNFAIR COMPETITION

34. Plaintiff realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 32 above as if same were repeated verbatim herein.

35. Defendants' acts complained of herein constitute unfair competition under the common law of the State of Texas.

## COUNT SIX

## INJURY TO BUSINESS REPUTATION UNDER TEXAS STATUTE

36. Plaintiff realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 35 above as if same were repeated verbatim herein.

37. Plaintiff and Defendants are competitors in the business of selling, leasing, renting and servicing farming equipment.

38. Defendants' acts complained of herein constitute an injury to Plaintiff's business reputation and dilute the distinctive quality of plaintiff's trademarks in violation of § 16.29 of the TEX. BUS. & COMM. CODE, and these acts or practices have caused and will continue to cause Plaintiff ascertainable loss or damage.

## COUNT SEVEN

## UNJUST ENRICHMENT

39. Plaintiff realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 38 above as if same were repeated verbatim herein.

40. Defendants' acts complained of herein constitute unjust enrichment of Defendants at the expense of Plaintiff.

49380:979822.1:082201                                   -7-

## COUNT EIGHT

### SUIT ON A SWORN ACCOUNT

41.  Plaintiff, incorporates herein, by reference, all of the factual allegations set forth in the preceding paragraphs.

42.  Defendant is indebted to Plaintiff for parts and materials supplied by Plaintiff to Defendants during the time Plaintiff was an authorized dealer of Plaintiff.  At all times during this period of time, Defendant maintained an account with Plaintiff.  *See* Exhibit "D" (Leisure affidavit).

43.  A systematic record of Defendants' account with Plaintiff has been kept and maintained, with dates of sales, services, charges, and credits, together with descriptions of the item(s) provided and the charges and payments made.  *See id.*

44.  Defendants owe Plaintiff the sum Fifty Thousand Seven Hundred One and 82/100 Dollars ($50,701.82) after all lawful credits and adjustments have been applied.  Defendants have refused to pay Plaintiff on the account.  *See id.*

45.  All just and lawful offsets, payments, and credits have been allowed and accounted for.  *See id.*

46.  On or about September 19, 2000, Plaintiff presented Defendants with a formal demand letter seeking payment in full for the balance of all monies owed.  *See* Exhibit "D."  To date, Defendants have failed and refused, and continue to fail and refuse, to pay Plaintiff the amount past due and owing.  Accordingly, Plaintiff seeks judgment against Defendants pursuant to Rule 185 of the Texas Rules of Civil Procedure, in the principal sum of not less than Fifty Thousand Seven Hundred One and 82/100 Dollars ($50,701.82), the balance past due and still owing to Plaintiff, together with all interest, costs, and attorney's fees to which Plaintiff is entitled.

## ATTORNEY'S FEES

47.  As a result of Defendants' failure to pay this claim, Plaintiff was forced to institute and prosecute this action.  Plaintiff is therefore entitled to recover its reasonable attorney's fees together with court costs.  As a result of Defendant's breach, Plaintiff seeks reimbursement for its reasonable attorney's fees as allowed by §38.001 of the Texas Civil Practice and Remedies Code and the dealer agreement between Plaintiff and Defendants.

### VI. APPLICATION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND PERMANENT INJUNCTION

48.  Pursuant to 15 U.S.C. §1116(a) ("Lanham Act"), Plaintiff requests that Defendants, their agents and/or representatives, and everyone acting on their behalf and/or at their direction, be prohibited from or required to do the following:

(1)    Prohibited from displaying any signs whatsoever and for any purpose that are emblazoned in any manner with Plaintiff's trademark, trade name, logos, or designs, including the names "New Holland," "Ford" and any New Holland Leaf logo and/or any colorable imitation thereof;

(2)    Prohibited from using the names "New Holland," "Ford" and any New Holland Leaf logo and/or any colorable imitation thereof in connection with the name and/or identification of Defendants' business;

(3)    Prohibited from representing to the public in any way, including oral and/or written advertisements and/or radio/television advertisements, broadcast in any location, including Texas and/or Mexico, that Defendants are or were an authorized dealer of Plaintiff;

(4)     Be required to immediately remove from Defendants' property any signs whatsoever that are emblazoned in any manner with Plaintiff's trademark, trade name, logos, or designs, including the names "New Holland," "Ford" and any Holland Leaf logo or any colorable imitation thereof; and

(5)     Be required to immediately remove from Defendants' stationary and/or any literature of any kind that are emblazoned in any manner with Plaintiff's trademark, trade name, logos, or designs, including the names "New Holland," "Ford" and any Holland Leaf logo or any colorable imitation thereof.

49.  The Lanham Act is clear in vesting the courts with the authority necessary to issue injunctions "according to the principles of equity" to prevent trademark infringement and/or dilution. *See* 15 U.S.C. § 1116(a).

50.  It is highly probable that Plaintiff will recover from Defendants after trial on the merits because the facts stated above have substantial evidentiary basis.

51.  If Plaintiff's application is not granted, irreparable harm is likely and imminent to Plaintiff because Defendants' continued, unauthorized use of Plaintiff's trademark and trade name is resulting in unfair competition to Plaintiff and is adversely impacting Plaintiff's reputation and goodwill.

52.  The harm that will result if the TRO is not issued is irreparable because the actual amount of money damages and damage to Plaintiff's valuable reputation and goodwill will be difficult, if not impossible, to ascertain if Defendants are not required to immediately remove all signs from their property emblazoned with Plaintiff's various trademarks and trade names.  Further,

those persons in active concert or participation with any of them, including but not limited to their licensees and franchisees:

(a)     From using, in connection with the promotion, advertising or selling, leasing, renting and/or servicing farming equipment and services, the infringing marks, namely "Leaf New Holland," "Ford" and "New Holland" or the designs associated therewith, or any colorable imitation or variation thereof, in connection with its business of sales and service of farm equipment, and the trade dress with which it is presented, the Plaintiff's trade dress and any other marks, names or other designations confusingly similar to Plaintiff's trademarks, trade names, and/or trade dress;

(b)     From otherwise competing unfairly with Plaintiff in any manner, including, but without limitation, (i) unlawfully adopting or infringing upon Plaintiff's marks, or (ii) adopting or using any other names, marks or designs that are confusingly similar to Plaintiff's marks or trade dress; and

(c)     From conspiring with, aiding, assisting or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a) and (b) above;

(2)     That the Court order Defendants, their agents, servants, employees, attorneys and all those persons in active concert or participation with any of them, including, but not limited to, their licensees and franchisees, to immediately remove and deliver up for destruction, or show proof of destruction of, any and all products, labels, signs, prints, packages, wrappers, receptacles and advertisements, and any other materials

49380:979822.1:082201                       -12-

in their possession or control, that depict the names or marks "Leaf New Holland," "Ford" and "New Holland" or the designs associated therewith, or any other mark confusingly or substantially similar to Plaintiff's marks and/or trade dress, and any materials or articles used for making or reproducing the same as provided by 35 U.S.C. § 1118;

(3)     That the Court order Defendants to file with the Court and to serve upon counsel for Plaintiff, within thirty (30) days after the entry and service on Defendants of an injunction, a report in writing and under oath setting forth in detail the manner and form in which Defendants have complied with the injunction;

(4)     That Plaintiff recover all damages it has sustained as a result of Defendants' infringement, unfair competition, unfair trade practices and unjust enrichment;

(5)     That said damages awarded to Plaintiff be trebled pursuant to 15 U.S.C. § 1117(a);

(6)     That an accounting be directed to determine Defendants' profits resulting from its infringement, unfair competition and unfair trade practices, and that such profits be paid over to Plaintiff, increased as the Court finds to be just and proper under the circumstances of this case;

(7)     That the Court award Plaintiff its reasonable attorneys' fees for prosecuting this action pursuant to 15 U.S.C. § 1117(a);

(8)     That the Court award Plaintiff punitive damages in such amount as the Court finds arises from the willful acts of common law unfair competition;

(9)  The Plaintiff recover from Defendant the sum of Fifty Thousand Seven Hundred One and 82/100 Dollars ($50,701.82), the balance past due and still owing to Plaintiff, together with all interest, costs, and attorney's fees to which Plaintiff is entitled;

(10)  That Plaintiff recover its costs of this action and prejudgment and post-judgment interest; and

(11)  That Plaintiff recover such other and further relief as the Court may deem just and proper.

Respectfully submitted,

By:_____

James H. Hunter, Jr.
Federal ID No. 15703
State Bar No.  00784311
Jon D. Brooks
Federal ID No. 24936
State Bar No. 24004563
Attorney-in-Charge for Plaintiff,
**New Holland North America, Inc.**

Of Counsel:

ROYSTON, RAYZOR, VICKERY & WILLIAMS, L.L.P.
55 Cove Circle
Brownsville, Texas 78521
(956) 542-4377
(956) 542-4370 (facsimile)

John William Stader
Scott C. Smith
NEW HOLLAND NORTH AMERICA, INC.
500 Diller Avenue
New Holland, PA 17557

49380:979822.1:082201                          -14-

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| NEW HOLLAND NORTH AMERICA, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION |
| VS. | § | |
| | § | NO._____ |
| ATLANTIC TRADING, INC. d/b/a | § | |
| TRACTOR-TEX and WILLIAM CURRAN, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## Verification

State of Pennsylvania     §
                          §
County of Lancaster       §

My name is J. William Stader, and I am over the age of 18 and am in all respects qualified and competent to make this affidavit. I am the Corporate Patent Counsel of New Holland North America, Inc.

The statements of fact in Plaintiffs' Original Petition and Application for Temporary Restraining Order and Preliminary Injunction are true and correct and based on my personal knowledge.

_J. William Stader_
J. William Stader

49380:980128.1:091701

Sworn to and subscribed before me, the undersigned authority, on the 21st day of September, 2001.

_____
Notary Public in and for the State of Pennsylvania

Notarial Seal
Sandra J. Mowrey, Notary Public
New Holland Boro, Lancaster County
My Commission Expires Dec. 15, 2004
Member, Pennsylvania Association of Notaries

49380:980128.1:091701

-2-

# Ford New Holland, Inc.

## DEALER AGREEMENT

THIS AGREEMENT was made as of the *19th* day of *January*, 19 *90*, between Ford New Holland, Inc., a

Delaware corporation with a place of business at 500 Diller Avenue, New Holland, Pennsylvania 17557 (the "Company"), and

a _____ Atlantic Trading, Inc. _____ ,
(Name of Entity)

corporation, incorporated in the State of Texas
(State whether an individual, partnership or corporation. If the latter, show name of the state in which incorporated.)

doing business as _____ Tractor-Tex _____ ,
(Trade Name)

and with its principal place of business at _____
(Street Address)

| Brownsville | Cameron | Texas | 78521 | (the "Dealer"). |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | |

IN CONSIDERATION of the representations and undertakings contained in this agreement, the Company and the Dealer agree as follows:

**A. APPOINTMENT.** The Company appoints the Dealer as a nonexclusive authorized dealer for the sale, leasing, rental and service of PRODUCTS, and the Dealer accepts this appointment.

**B. AGREEMENT TO SELL AND PURCHASE.** In accordance with the terms of this agreement, the SOURCES shall sell PRODUCTS to the Dealer, and the Dealer shall purchase PRODUCTS from the SOURCES.

**C. TERMS INCORPORATED.** The Company's Dealer Agreement Standard Provisions (Form FNH 7562, January 1987; the "Standard Provisions"), a copy of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed by each party. The Standard Provisions and any supplement or amendment thereto duly executed by both the Company and the Dealer and properly delivered are a part of this agreement as if herein set forth in full.

**D. AUTHORIZED PERSONNEL.** This agreement shall bind the Company only if it bears the manual or facsimile signature of the Vice President — Sales and Marketing of the Company and the manual countersignature of the Director, North American Sales of the Company and a fully executed copy is delivered personally or by mail to the Dealer at his principal place of business. No one except the Vice President — Sales and Marketing of the Company or the Director, North American Sales of the Company or the Secretary or an Assistant Secretary of the Company is authorized on behalf of the Company to make any other agreement relating to the subject matter of this agreement or to modify any provision of this agreement or to terminate this agreement, and then only by a written instrument.

**E. DEALER OWNERS AND MANAGERS.**

1. The Dealer represents that it conducts business under the legal form shown on Schedule A(i).

2. The Dealer represents that it is owned by the persons listed on Schedule A(ii), which schedule the Dealer further represents contains the complete list of persons holding an ownership interest in the Dealer.

3. The Dealer represents that it is managed by the person(s) listed in Schedule A(iii), which schedule the Dealer further represents contains the complete list of those who have full authority and responsibility for the management of the Dealer in the performance of this agreement.

4. The Dealer shall give the Company notice of any proposed change in the legal form of the Dealer and any proposed change in Dealer ownership or managerial authority, and immediate notice of the death or incapacity of any person listed in Schedule A. No change in Dealer ownership or managerial authority shall be effective against the Company until embodied in an appropriate amendment to Schedule A or an assignment of this agreement, duly executed by the Company and the Dealer and properly delivered. The Company shall not withhold unreasonably consent to any change in Dealer ownership or management, but, with respect to a change in ownership, may apply the criteria set forth in Paragraph 18 (d).

(i)

**EXHIBIT**

"A"

**F. DURATION.** Unless terminated earlier in accordance with Paragraph 21, this agreement shall continue from the date first set forth above until December 31, 19 _90_ ; provided, however, this agreement automatically shall be extended for a three-year term unless at least six months prior to the initial expiration date (or any subsequent expiration date with respect to any extension of this agreement) either party notifies the other of the intention not to have the term of this agreement extended.

**G. SUPERSESSION AND ENTIRE AGREEMENT.** This agreement terminates and supersedes all other agreements between the Dealer and any SOURCE (and any affiliate of any SOURCE) for the sale and service of PRODUCTS (or any of them). This agreement contains the entire agreement between the parties with respect to its subject matter, and each party acknowledges that, except as expressly stated in this agreement, no representation, understanding or presumption of law or fact has been made or relied upon that has induced the execution of this agreement, or would in any way modify any of its provisions or with respect to the effectiveness, duration or termination of this agreement or the sales or profit expectancy of the Dealer. The Dealer has decided to become an authorized dealer in PRODUCTS and to make the investments necessary to become a dealer solely in reliance on his investigation, appraisal and projection of present and future conditions and expectations in the PAR and not in reliance on any statements made or documents exhibited to the Dealer by the Company or any SOURCE. The dealer voluntarily has entered into this agreement without coercion, intimidation or threats from the Company or any SOURCE, and acknowledges that each provision of this agreement is reasonable, fair and equitable.

**H. NO IMPLIED WAIVER.** The waiver by either party or the failure by either party to claim a breach of any provision of this agreement shall not constitute a waiver of any subsequent breach or affect in any way the effectiveness of that provision.

**I. NOTICE, APPROVAL AND CONSENT.** Any notice, approval or consent required or allowed under this agreement shall be given in writing and, without prejudice to other forms of actual service, shall be considered as served upon being mailed in a properly sealed envelope with first class or certified or registered postage prepaid. Notices to the Company shall be delivered or mailed to the Branch Manager of the area in which the DEALER LOCATION is found. Notices to the Dealer shall be delivered or mailed to any person designated in Schedule A(ii) or to the Dealer at the Dealer's principal place of business above described.

**J. AMENDMENT AND SEPARABILITY.** The Company may amend this agreement in case of legislation, government regulation or changes in circumstances beyond the reasonable control of the Company that in the opinion of the Company might affect materially the relationship between the Company and the Dealer. If performance under this agreement is illegal under a valid law of any jurisdiction where that performance is to take place, the performance will be modified to the minimum extent necessary to comply with any law that was in effect on the date this agreement was executed.

IN WITNESS WHEREOF the parties have duly executed this agreement in triplicate as of the day and year first above written.

**Ford New Holland, Inc.**

By: _____
Vice President — Sales and Marketing

Countersigned by:

_____
Director, North American Sales

Atlantic Trading, Inc. dba
Tractor-Tex
_____
Dealer Trade Name

By: _____

Title: President

(ii)

Dealer Name and Address:
    Atlantic Trading, Inc., dba

Name  Tractor-Tex
                TRADE NAME

Address  Brownsville
            CITY AND STATE

# Schedule A
# Dealer Agreement

## OWNER AND MANAGERS

(i) The Dealer conducts business
under the following legal form: _____ Corporation _____
                                (PROPRIETORSHIP, PARTNERSHIP OR CORPORATION)

(ii) Owners of the Dealer:

| Names | Percent of Ownership |
|---|---|
| William Curran | 34 |
| Jesus Nader | 33 |
| Eugene Uribe | 33 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

(iii) Persons responsible for the management of the Dealer:

| Name | Title |
|---|---|
| William Curran | President |
| | |
| | |
| | |

(iv) State Retail Sales Tax Registration Number: _____ 3-01135-8962-3 _____

Date: _____ _January 19, 1990_

Dealer Name and Address:
Atlantic Trading, Inc., dba

Name __Tractor-Tex__

TRADE NAME

Address __Brownsville, TX__

CITY AND STATE

# SCHEDULE B
# DEALER AGREEMENT

## SOURCE OF EQUIPMENT

| SOURCE | PRODUCT LINE* |
|---|---|
| FORD NEW HOLLAND, INC. | ☒ Ford Agricultural Tractors |
| | ☒ Ford Industrial Tractors |
| | ☒ Ford Consumer Products |
| | ☐ Limited-Line Tractors and Ford Consumer Products |
| | ☒ New Holland Agricultural Equipment, Including the full line of New Holland farm implements, twine and wire, but excluding combines and self-propelled forage harvesters |
| | ☒ New Holland Self-Propelled forage harvesters |
| | ☒ New Holland Combines |
| | ☒ New Holland Skid-Steer Loaders |
| | ☒ New Holland Articulated Loaders, Including articulated loader/backhoes |
| | ☒ Versatile 4-Wheel Drive Tractors |
| | ☒ Versatile Bi-Directional Tractors |
| | ☐ Versatile Pull-Type Combine |
| | ☐ Versatile Swathers |

*Each PRODUCT LINE designated must be initialled by both the Dealer and the Company.

Ford New Holland, Inc.

By _____
Vice-President - Sales and Marketing

Countersigned by:

_____
Director, North American Sales

Date: __January 19, 1990__

220049  REV. 12/87   PRINTED IN USA



# DEALER AGREEMENT

Dealer Name and Address:
Atlantic Trading, Inc., dba

Name  Tractor-Tex
_____
TRADE NAME

Address  Brownsville, TX
_____
CITY AND STATE

## DEALER LOCATION, INDUSTRY POTENTIAL AND PAR

### PRINCIPAL DEALER LOCATION

Approved Dealer Location:

Street Address _____

City  Brownsville _____ State  Texas _____ Zip Code _____

### BRANCH LOCATION

Street Address _____

City _____ State _____ Zip Code _____

### PRIMARY AREA OF RESPONSIBILITY AND INDUSTRY POTENTIAL

The PAR shall mean the NON-EXCLUSIVE area designated below by the Company as the area of the Dealer's sales and service responsibility for PRODUCTS, which area may be different for different PRODUCT LINES. It is -EXCLUSIVE to Dealer.

The following chart identifies that portion (%) of the industry unit sales potential within the PAR that the Dealer is expected to participate in by PRODUCT LINES. The portion of industry unit sales potential just described will be reviewed periodically by Ford New Holland and the Dealer will be advised of changes. This percentage, along with market share objectives and industry unit sales potential information, will be used to establish annual Dealer sales objectives.

### PRODUCT LINES AND % COUNTY SHARE

| VERSATILE | | | | FORD | | | | NEW HOLLAND | | | | | COUNTIES | STATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4-WD | BI-DIR | PULL-TYPE COMBINE | SWATHER | AG. | IND. | CON-SUMER | LIMITED | AG. | SP | COMBINE | S. LOADERS | A. LOADERS | | |
| 80 | 80 | | | 80 | 80 | 80 | | 80 | | | 80 | 80 | Cameron | TX |
| | | | | | | | | 50 | | | 50 | 50 | Willacy | TX |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |

Ford New Holland, Inc.

By _____
Director, North American Sales Operations

Countersigned by:

_____
Branch Manager

Date _____  1-19-90

220052  REV. 5/88   PRINTED IN USA

# TABLE OF CONTENTS
## FORD NEW HOLLAND, INC.
### DEALER AGREEMENT

| Paragraph | | Page |
|---|---|---|
| A. APPOINTMENT | | (i) |
| B. AGREEMENT TO SELL AND PURCHASE | | (i) |
| C. TERMS INCORPORATED | | (i) |
| D. AUTHORIZED PERSONNEL | | (i) |
| E. DEALER OWNERS AND MANAGERS | | (i) |
| F. DURATION | | (ii) |
| G. SUPERSESSION AND ENTIRE AGREEMENT | | (ii) |
| H. NO IMPLIED WAIVER | | (ii) |
| I. NOTICE AND CONSENT | | (ii) |
| J. AMENDMENT AND SEPARABILITY | | (ii) |
| 1. DEFINITIONS | | |
| (a) | Equipment | 1 |
| (b) | Genuine Parts | 1 |
| (c) | Products | 1 |
| (d) | Product Lines | 1 |
| (e) | Primary Area of Responsibility | 1 |
| (f) | Dealer Location | 1 |
| (g) | Branch Locations | 1 |
| (h) | Dealer Price | 1 |
| (i) | Manual | 1 |
| (j) | Terms of Sale Bulletin | 1 |
| (k) | Sources | 1 |
| 2. SALES RESPONSIBILITY | | 1 |
| 3. SERVICE RESPONSIBILITY | | |
| (a) | General | 2 |
| (b) | Predelivery | 2 |
| (c) | Warranty and Policy | 2 |
| (d) | Campaigns | 2 |
| 4. STOCKS | | 2 |
| 5. ORDERS | | 2 |
| 6. PRICES AND CHARGES | | 3 |
| 7. TERMS OF PAYMENT, DELIVERY AND TITLE RETENTION | | |
| (a) | Payment | 3 |
| (b) | Delivery | 3 |
| (c) | Title and Security Interest | 3 |
| (d) | Risk of Loss and Claims | 4 |
| (e) | Demurrage and Diversion Liability | 4 |
| (f) | Taxes | 4 |
| 8. ADVERTISING, PROMOTION AND TRADE PRACTICES | | 4 |
| 9. LITERATURE AND INSTRUCTION | | 4 |

| Paragraph | | Page |
|---|---|---|
| 10. CUSTOMER HANDLING | | 4 |
| 11. PERSONNEL | | 5 |
| 12. PREMISES AND EQUIPMENT | | 5 |
| 13. WARRANTY | | 5 |
| 14. CAPITAL | | 5 |
| 15. SIGNS | | 5 |
| 16. ACCOUNTING SYSTEM | | 5 |
| 17. REPORTS, AUDITS AND RECORDS | | 6 |
| 18. MARKET REPRESENTATION | | 6 |
| 19. MODEL CHANGE | | 7 |
| 20. TRADEMARKS AND TRADE NAMES | | |
| (a) | Use in Title | 7 |
| (b) | Other Use | 7 |
| (c) | Goodwill and Reputation | 7 |
| 21. TERMINATION | | |
| (a) | At Will | 7 |
| (b) | Replacement Agreement | 7 |
| (c) | Breach | 7 |
| (d) | With Immediate Effect | 7 |
| 22. OBLIGATIONS UPON TERMINATION | | 8 |
| 23. ACQUISITION OF CERTAIN PROPERTY UPON TERMINATION | | 8 |
| 24. RELATIONS AFTER TERMINATION | | 9 |
| 25. NEW AGREEMENT | | 9 |
| 26. LIMITATION OF LIABILITY | | 9 |
| 27. AGENCY OR EMPLOYMENT RELATIONSHIP | | 9 |
| 28. ASSIGNMENT | | 9 |
| 29. APPLICABLE LAW | | 9 |

# Ford New Holland, Inc.

## DEALER AGREEMENT
## STANDARD PROVISIONS

### 1. DEFINITIONS

The following definitions shall apply throughout this agreement:

(a) EQUIPMENT shall mean those models of equipment and attachments therefor that are designated from time to time by the Company in Schedule B as available from the SOURCE designated in Schedule B.

(b) GENUINE PARTS shall mean assemblies, subassemblies, components and accessories (and any part thereof) for EQUIPMENT offered by the SOURCES to authorized dealers in EQUIPMENT.

(c) PRODUCTS shall mean EQUIPMENT and GENUINE PARTS.

(d) PRODUCT LINES shall mean the categories of EQUIPMENT designated from time to time by the Company in Schedule B as available from a particular SOURCE.

(e) PRIMARY AREA OF RESPONSIBILITY ("PAR") shall mean the geographic area designated in Schedule C by the Company as the area of the Dealer's sales and service responsibility for PRODUCTS, which area may be different for different PRODUCT LINES.

(f) DEALER LOCATION shall mean the place or places of business of the Dealer within the PAR designated in Schedule C (ii) for sale and service of PRODUCTS, including any BRANCH LOCATION(S).

(g) BRANCH LOCATION(S) shall mean the secondary place or places of business of the Dealer (operated directly or through an affiliate) within the PAR designated in Schedule C (ii) for the sale (and, where the Dealer elects, the rental and leasing), service or both under this agreement separate from the Dealer's principal place of business.

(h) DEALER PRICE shall mean the price to the Dealer for PRODUCTS established by the appropriate SOURCE from time to time exclusive of any holdback, deposit or charge, including any charge by the SOURCE for taxes, handling, delivery, transportation, special items and services.

(i) MANUAL shall mean the appropriate SOURCE'S PRODUCTS Warranty and Policy Manual, as amended from time to time by the appropriate SOURCE, which document is made part of this agreement.

(j) TERMS OF SALE BULLETIN shall mean the latest bulletin and amendments thereto provided to the Dealer by the appropriate SOURCE setting forth the terms of sale and ordering procedure applicable to sales of PRODUCTS to authorized dealers.

(k) SOURCE(S) shall mean the respective company or companies designated from time to time by the Company in Schedule B as the source for a PRODUCT LINE.

### 2. SALES RESPONSIBILITY

(a) The Dealer shall promote vigorously and aggressively the sale (and, where the Dealer elects, the leasing and rental) at retail of PRODUCTS to customers in the PAR in order to assure maximum sales, leases and rentals of PRODUCTS, and shall develop energetically and to the satisfaction of the Company the potentials for such sales, leases and rentals and shall obtain a reasonable share thereof and a reasonable share of the total market comprised of PRODUCTS and products of other manufacturers that compete with PRODUCTS; but the Dealer shall not be limited to the PAR in making sales, leases or rentals of PRODUCTS.

(b) The Dealer shall develop, maintain and direct a trained, quality sales organization and shall conduct aggressive advertising and sales promotion activities, making use to the greatest reasonable extent the Company's advertising, sales promotion and merchandising programs and materials.

-1-

(c)   The Dealer's performance of his PRODUCTS sales (and, where appropriate, leasing and rental) responsibility shall be measured by using reasonable criteria developed by the Company, taking into consideration the Dealer's total sales, leases and rentals of PRODUCTS and his sales, leases and rentals of PRODUCTS broken down by PRODUCT LINE, to customers in the PAR. The Dealer's performance under any prior agreement with the Company, any SOURCE or any affiliate of either, may be considered in evaluating the Dealer's performance under this, and any succeeding agreement. The Company may from time to time conduct surveys (by use of questionnaires or otherwise) of owners, lessees and renters of EQUIPMENT purchased, leased or rented from the Dealer to determine the satisfaction of those owners, lessees and renters with the sales, leasing and rental efforts of the Dealer. The results of these surveys will be taken into consideration in assessing the Dealer's performance under this Paragraph 2.

(d)   The Dealer shall not offer for sale, sell or use in the service or repair of any PRODUCT, as a GENUINE PART, any assembly, subassembly, component, accessory (or any part thereof) that is not a GENUINE PART. The Dealer shall inform customers in writing (by placing a prominent statement on the documents generated by the Dealer in connection with the transaction in question) on every occasion that he uses for the repair or maintenance of a PRODUCT or sells a part or an accessory that is not a GENUINE PART.

(e)   The Dealer shall notify the appropriate SOURCE if any new and unused EQUIPMENT in the Dealer's possession is substantially damaged. To preserve the quality and value of new EQUIPMENT offered to the public, the appropriate SOURCE shall have the option to repair or replace any such EQUIPMENT. The Dealer shall assign to the appropriate SOURCE the Dealer's rights under any insurance contract related to such EQUIPMENT repaired or replaced by the SOURCE.

## 3.  SERVICE RESPONSIBILITY

(a)  **General.** In accordance with standards and procedures established by the Company, the Dealer shall develop, maintain and direct a trained and competent service organization and shall render at the DEALER LOCATION and in the field (as is appropriate for the season) and at any BRANCH LOCATION established for the purpose of service, prompt workmanlike and courteous service to owners and users of PRODUCTS. The Company may from time to time conduct surveys (by use of questionnaires or otherwise) of the Dealer's PRODUCTS service customers to determine their satisfaction with the Dealer's service efforts. The results of these surveys will be taken into consideration in assessing the Dealer's performance under this Paragraph 3 (a).

(b)  **Predelivery.** In accordance with instructions issued by the appropriate SOURCE, the Dealer shall perform inspection, conditioning and repair of EQUIPMENT before delivery by the Dealer to a retail purchaser, lessee or rentee.

(c)  **Warranty and Policy.** The Dealer shall perform warranty and policy service on PRODUCTS, whether or not sold by the Dealer, in accordance with the applicable warranty and policy and the provisions of the MANUAL.

(d)  **Campaigns.** The Dealer shall perform campaign inspections and make campaign corrections for owners and users of PRODUCTS in accordance with campaign instructions issued by the appropriate SOURCE and the provisions of the MANUAL.

(e)  Except as otherwise instructed by the Company, the Dealer shall use only GENUINE PARTS in performing warranty, policy and campaign work. The Dealer shall give precedence to warranty, policy and campaign work over other service work if use of the EQUIPMENT submitted for warranty, policy or campaign work is impaired.

## 4.  STOCKS

The Dealer shall maintain at all times stocks of PRODUCTS of an assortment and in quantities adequate to meet the current and anticipated demand therefor and to fulfill the Dealer's sales and service obligations under this agreement.

## 5.  ORDERS

(a)   The Dealer shall submit to the appropriate SOURCE at times designated by that SOURCE and on forms provided by (or approved by) that SOURCE (or in accordance with the TERM OF SALES BULLETIN or other procedures established by that SOURCE), orders for the PRODUCTS required by the Dealer and its BRANCH LOCATIONS.

(b)   The appropriate SOURCE shall make reasonable efforts to honor each PRODUCTS order from the Dealer accepted by the SOURCE, but the SOURCE shall not be liable for failure to deliver or delay in delivery of PRODUCTS where the failure or delay was due wholly or in part to (i) a shortage of material, labor, transportation or utility services, (ii) any labor or production difficulty experienced by the SOURCE or any of its suppliers, (iii) any governmental action or (iv) any cause beyond the SOURCE'S reasonable control or without the SOURCE'S fault or negligence.

(c)   Orders for PRODUCTS are accepted by the SOURCE when the order is expressly acknowledged in writing or the ordered PRODUCTS are delivered to the Dealer or the carrier. The SOURCES may install any equipment or accessories required by law on any EQUIPMENT ordered by a Dealer whether or not these mandatory items were included in the Dealer's order.

## 6.   PRICES AND CHARGES

Unless otherwise determined by the SOURCE in the TERMS OF SALE BULLETIN or by other written notice to the Dealer, the following provisions shall apply:

(a)   The Dealer shall pay the SOURCE the DEALER PRICE for each PRODUCT purchased from the SOURCE by the Dealer, plus any holdback and charges by the SOURCE for reimbursement of taxes, duties, transportation, handling, delivery or special items or services. The SOURCE may change the DEALER PRICE, holdback, reimbursement and other charges at any time and from time to time without prior notice to the Dealer. Except as otherwise specified in writing by the SOURCE, the DEALER PRICE and charges shall be those in effect, and delivery to the Dealer shall be deemed made and the order filled, on the date of delivery by the SOURCE to the carrier or to the Dealer.

(b)   If the SOURCE increases the DEALER PRICE for any PRODUCT, the Dealer may cancel, by notice to the SOURCE within 10 days after his receipt of notice of the increase, any orders for that PRODUCT placed by the Dealer prior to receiving notice of the increase and unfilled at the time the SOURCE receives the Dealer's notice of cancellation.

(c)   If the SOURCE reduces the DEALER PRICE for any new, current model of EQUIPMENT (except with respect to any current model of EQUIPMENT being discontinued by the SOURCE and except DEALER PRICE reductions resulting from the application of any law, government regulation or order), the SOURCE shall refund or credit to the Dealer, on each new, unused and unsold unit of EQUIPMENT of the same current model that is in the possession of the Dealer on the effective date of the price reduction, the difference between the reduced DEALER PRICE and the DEALER PRICE at which the Dealer purchased the EQUIPMENT (less any amount previously credited or refunded to the Dealer) provided the EQUIPMENT was purchased from the SOURCE during the 24 months immediately preceding the effective date of the DEALER PRICE reduction. The Dealer shall be entitled to the refund or credit only if a claim is made to the SOURCE in writing within 10 days after the effective date of the DEALER PRICE reduction. If any EQUIPMENT is the subject of any trust instrument or similar agreement, the SOURCE may pay all or part of any refund or credit thereon to the holder of the trust instrument or similar agreement. The SOURCE need not make any payments under this Paragraph 6(c) with respect to (i) any reduction in the SOURCE'S charges for distribution, handling, delivery, advertising or taxes, (ii) any change in discounts that may be offered or (iii) any sales incentive or other similar payments offered by the SOURCE to the Dealer.

## 7.   TERMS OF PAYMENT, DELIVERY AND TITLE RETENTION

Unless otherwise determined by the SOURCE in the TERMS OF SALE BULLETIN or by other written notice to the Dealer, or determined by reference to a wholesale installment sales and security agreement between the Dealer and the SOURCE, the following provisions shall apply:

(a)   **Payment.** Payment for each PRODUCT shall be made in cash unless the invoice or the SOURCE'S then current and applicable payment plan (including payment on an installment sales basis) provides otherwise, in which event the terms of the invoice or the plan shall govern. Receipt of any check, draft or other commercial paper shall not constitute payment until the SOURCE has received cash in the full amount thereof. The Dealer shall pay all collection charges, including reasonable attorneys' fees.

(b)   **Delivery.** The SOURCE reserves the right to determine the method and routing for the delivery of PRODUCTS sold to the Dealer under this agreement. Where specific shipping instructions are not stated in the order, the SOURCE will endeavor to ship over the best and most economical route. The SOURCE shall not be responsible for guaranteeing rates or for delays in shipments. In cases where the order submitted by the Dealer specifies a date for Dealer collection at a SOURCE depot or other location and PRODUCTS are not called for within 10 days of that date, the SOURCE may ship the PRODUCTS ordered, and the cost shall be borne by the Dealer.

(c)   **Title and Security Interest.** Title to each PRODUCT purchased by the Dealer shall pass to the Dealer or to the finance institution designated by the Dealer upon delivery by the SOURCE to a carrier or the Dealer. The SOURCE shall retain a purchase money security interest in any PRODUCT and the proceeds thereof until paid in full. Should the Dealer not pay the SOURCE in full in accordance with the agreed payment terms, the SOURCE may revoke the sale and repossess the PRODUCT without notice or other formality.

CoolPDF - www.fasiso.com

(d) **Risk of Loss and Claims.** The SOURCE shall assume all risk of loss and damage to any PRODUCT purchased by the Dealer from the SOURCE that is not borne by the carrier while the PRODUCT is in the possession of the carrier, provided the Dealer upon delivery properly inspects and records any loss of or damage to the PRODUCT. In accordance with the MANUAL, the Dealer shall cooperate with the SOURCE in processing all claims for loss of or damage to PRODUCTS.

(e) **Demurrage and Diversion Liability.** The Dealer shall pay all demurrage, storage and other charges accruing after arrival of any shipment of PRODUCTS at the final destination. If the Dealer fails or refuses for any reason (other than labor difficulty at the Dealer's place of business or any cause beyond the Dealer's control or without the Dealer's fault or negligence) to accept delivery of any PRODUCT ordered by the Dealer, the Dealer shall pay the SOURCE the amount of all expenses incurred by the SOURCE in shipping PRODUCTS to the Dealer and in returning PRODUCTS to the original shipping point or diverting them to another destination; but the Dealer need not pay the SOURCE more for diversion than the expense of returning the PRODUCT to its original shipping point.

(f) **Taxes.** The Dealer represents that all PRODUCTS purchased from the SOURCE are purchased for resale in the ordinary course of the Dealer's business. The Dealer further represents that he has complied with all requirements for collection and payment of applicable sales, use and like taxes, and has provided or will provide evidence thereof to the SOURCE. These representations shall be deemed a part of each order given by the Dealer to the SOURCE. The Dealer agrees that, as to any PRODUCT put to a taxable use by the Dealer or purchased by the Dealer other than for resale, the Dealer shall make timely and proper return and payment of all applicable sales, use and other taxes, and shall hold the SOURCES harmless from all claims and demands for those taxes.

## 8. ADVERTISING, PROMOTION AND TRADE PRACTICES

(a) The Dealer shall conduct business under this agreement in a manner that will reflect favorably at all times on the Dealer, the Company, the SOURCES, PRODUCTS and other authorized dealers in PRODUCTS. The Dealer shall refrain from business practices, advertising and promotion that are unethical, deceptive, misleading, confusing or would be likely to contravene any voluntary or involuntary advertising standard or any law. The Dealer shall not make directly or indirectly any false or misleading statement or representation concerning any PRODUCT or other item of sale, its source, condition or capabilities, the prices or charges therefor or the charges made by the SOURCE for distribution, delivery, taxes or other items.

(b) The Dealer shall comply with all laws, rules and regulations applicable to the ordering, sale and service of PRODUCTS and used products, including those concerning safety, emissions control and customer service.

(c) If the Dealer modifies new EQUIPMENT or installs on new EQUIPMENT any equipment, accessory or part that has not been supplied by a SOURCE, or sells any EQUIPMENT that has been modified, or sells any non-SOURCE service contract in conjunction with the sale of EQUIPMENT, the Dealer will disclose this fact to the purchaser and will advise the purchaser that the modification, equipment, accessory or part is not included in warranties provided by the SOURCES or, in the case of a service contract, the coverage is not provided by a SOURCE. The Dealer will write this disclosure on the purchase order and on the purchaser's bill. With respect to used EQUIPMENT, the Dealer shall not represent the source of any modification, accessory, part or service contract to be a SOURCE if the source is not a SOURCE.

## 9. LITERATURE AND INSTRUCTION

(a) In accordance with the appropriate SOURCE'S instructions, the Dealer shall complete, execute and deliver to each retail purchaser of a PRODUCT the appropriate current publications and forms for owners covering operation, maintenance, warranty and other matters as determined by the SOURCE. The Dealer promptly shall comply with its obligations under these publications.

(b) The Dealer will instruct each purchaser, lessee or renter of a PRODUCT from the Dealer in the safe use and operation of that PRODUCT.

## 10. CUSTOMER HANDLING

The Dealer promptly shall investigate and take appropriate corrective action to satisfy the customer with respect to all matters brought to his attention relating to the sale and service of PRODUCTS, shall make regular contact with owners and users of PRODUCTS in the PAR and shall report promptly to the Company the details of each inquiry or complaint concerning a PRODUCT the Dealer cannot correct satisfactorily.

## 11. PERSONNEL

The Dealer shall employ and train a sufficient number of competent personnel of good character, including managers, salesmen and technicians, to meet the Dealer's obligations under this agreement and shall cause these personnel to attend training programs as the Company may request from time to time.

## 12. PREMISES AND EQUIPMENT

(a)   The Dealer shall establish and maintain within the PAR at a location approved by the Company a place of business that, in the Company's opinion, (i) is of satisfactory size, layout, appearance and condition, (ii) contains adequate space for display, sales and service of PRODUCTS, the sale of used products, customer parking and waiting, office functions and storage and (iii) is equipped with adequate tools, equipment and machinery, as will enable the Dealer to meet its obligations under this agreement.

(b)   The Dealer may establish and maintain BRANCH LOCATIONS for the sale, service or both of PRODUCTS at locations approved by the Company within the PAR. The Dealer shall require each BRANCH LOCATION to provide facilities, tools and equipment adequate to meet the needs of that BRANCH LOCATION in view of the business to be conducted and the portion of the PAR to be served by the BRANCH LOCATION. The obligations of the Dealer under this agreement relevant to the business to be conducted at the BRANCH LOCATION shall extend to that BRANCH LOCATION.

(c)   Without the prior consent of the Company, the Dealer shall not move or substantially modify his place or places of business or establish, directly or indirectly, any other place of business, including BRANCH LOCATIONS, for the sale, leasing, rental or service of PRODUCTS.

(d)   The Dealer shall keep his place or places of business open during all hours and days customary in the trade and lawful in the PAR.

## 13. WARRANTY

(a)   The warranties covering PRODUCTS are set forth in the MANUAL. The Dealer shall expressly incorporate (whether by reference to a separate warranty statement provided to the purchaser or otherwise) the appropriate EQUIPMENT warranty as part of each purchaser's order form or other contract for the sale of EQUIPMENT. The Dealer shall expressly incorporate the appropriate GENUINE PARTS warranty as part of each sale of a GENUINE PART, in accordance with instructions set forth in the MANUAL. The SOURCE and the Dealer promptly shall fulfill their responsibilities under these warranties.

(b)   EXCEPT FOR THE WARRANTY EXTENDED UNDER THIS PARAGRAPH 13 AND, WITH RESPECT TO THE DEALER, EXCEPT FOR CERTAIN OTHER PROVISIONS OF THIS AGREEMENT, THERE SHALL BE NO OTHER WAR-RANTY, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICU-LAR PURPOSE OR ANY OTHER OBLIGATION OF THE SOURCE TO THE DEALER OR THE OWNER WITH RESPECT TO PRODUCTS.

(c)   The performance and administration of the warranties extended under this Paragraph 13 and the payment of claims under these warranties shall be as set forth in the MANUAL.

## 14. CAPITAL

The Dealer shall at all times employ in connection with its business under this agreement the total investment, net working capital, lines of credit and retail financing plans necessary for the Dealer to comply with its obligations under this agreement.

## 15. SIGNS

The Dealer shall acquire, erect and maintain signs of good appearance, compatible with design and quality standards established by the Company and adequate to identify the DEALER LOCATION and any BRANCH LOCATION as an authorized dealer in PRODUCTS. These signs shall be subject to the Company's approval with respect to the display of any trademark or trade name to which the Company or any of its affiliates is entitled. Compliance with any separate dealership identification agreement between the Dealer and the Company shall be deemed compliance with this Paragraph 15. At the request of the Dealer, the Company will make available, at a mutually convenient time and place, personnel to counsel and advise the Dealer on signs and identification.

## 16. ACCOUNTING SYSTEM

The Dealer shall install and use in its business of selling and servicing PRODUCTS an accounting and record keeping system acceptable to the Company. However, that system need not be the only system used by the Dealer.

## 17. REPORTS, AUDITS AND RECORDS

(a)   The Dealer shall provide to the Company each month at the time and on the forms prescribed by the Company a complete statement reflecting the true financial condition and the current month and year-to-date operating results of the Dealer's business in PRODUCTS and trade-ins thereon as of the end of the preceding month. The Dealer also promptly shall provide to the Company a copy of any annual statement (audited or not) and adjustments thereto that is prepared by or for the Dealer and submit sales reports, registration cards and other business, sales and service reports and documents the Company requests. All statements and reports shall contain information on any BRANCH LOCATION and shall be based, whenever applicable, on the accounting system required by Paragraph 16. Financial information provided by the Dealer shall be treated confidentially except where required to be disclosed by law or offered in evidence in a hearing or where included as an unidentified part of a composite or coded report.

(b)   The Dealer shall permit persons designated by the Company, at reasonable times and intervals and during normal business hours, to examine its place or places of business, stocks of PRODUCTS and other equipment at the DEALER LOCATION and any BRANCH LOCATION, to test equipment, to check and instruct the Dealer and his employees in the proper handling of warranty and other repairs and claims based thereon and to examine, copy and audit all the Dealer's records and documents relating to the Dealer's PRODUCTS business. The Dealer shall maintain all records and documents relating to claims made upon or paid by the Company or any SOURCE for at least one year in the case of warranty and policy claims and for at least two years in the case of other claims. Failure to maintain records or submission of improper claims may result in a chargeback against the Dealer account with the Company or the appropriate SOURCE.

## 18. MARKET REPRESENTATION

(a)   Without liability to the Dealer, the Company may determine the numbers, locations and sizes of dealers necessary for adequate PRODUCTS sales, leasing, rental and service representation and may appoint additional dealers in PRODUCTS and alter the PAR. The Company will notify the Dealer of any decision to add an additional dealer in PRODUCTS to the PAR, to alter the PAR or both. Notwithstanding any other provision of this agreement, the final decision whether to establish an additional dealer shall be made by the Company solely upon its own business judgment, and nothing in this agreement shall be construed as requiring the Dealer's consent to the establishment of an additional dealer. The Company will give the Dealer written notice of any market representation plan that does not provide for the continuation of representation of PRODUCTS from the DEALER LOCATION and any BRANCH LOCATIONS.

(b)   The Dealer may make purchases from others without liability to the Company or the SOURCES but shall not be relieved of its obligations under this agreement. The Company and SOURCES may make sales, loans or leases of PRODUCTS to others without liability to the Dealer. The Company and SOURCES also may offer any new, different and differently designed product, bearing any trademarks or tradenames to which the Company or any of its affiliates is entitled, to selected authorized dealers or others under existing or new agreements.

(c)   In view of the personal nature of this agreement, the rights and privileges conferred on the Dealer under this agreement are not transferable, assignable or salable by the Dealer, and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. The Company may select the dealers it shall appoint to distribute and service PRODUCTS and may refuse to appoint as an authorized dealer any purchaser or prospective purchaser of any of the shares or assets of the Dealer upon the termination of this agreement or otherwise. The Dealer has not paid any fee for this agreement.

(d)   The Company acknowledges that the Dealer may sell the assets used by the Dealer in meeting its obligations under this agreement. In turn, the Dealer acknowledges that the Company has the right to approve or not any prospective purchaser as to his character, relevant business experience, management experience and plans, capital and other qualifications for appointment as an authorized dealer in PRODUCTS at the DEALER LOCATION. In assessing the qualifications of any such prospective purchaser, the Company may rely upon surveys (conducted by use of questionnaires or otherwise) of the prospective purchasers sales and service customers in any business in which the prospective purchaser has been involved. If the Company believes the price to be paid for the Dealer's assets, on the basis of average operating results of other dealers, likely would result in an unsatisfactory return on investment, the Company may so inform the prospective purchaser without liability to the Dealer.

CSNPDF - www.fssto.com

## 19. MODEL CHANGE

Without giving notice to the Dealer and without incurring any liability to the Dealer, (i) the design, construction and availability of any PRODUCT may be altered or discontinued and the equipment thereof may be modified, (ii) any PRODUCT, any derivative of a PRODUCT and any version of any derivative of a PRODUCT may be withdrawn from the market and (iii) additional or replacement products may be marketed by the Company and the SOURCES.

## 20. TRADEMARKS AND TRADE NAMES

(a)  **Use in Title.** The Dealer shall not use as or as part of its trading or firm title any name that is not acceptable to the Company. The Dealer shall not use as or as part of its trading or firm name any trademark or trade name to which the Company or any of its affiliates is entitled or any coined word or combination containing any part of those trademarks or trade names unless the Company shall have first consented to that use. If, after this consent, the Company at any time requests, the Dealer shall discontinue promptly that use and shall take all steps that in the opinion of the Company are necessary to eliminate any such trademark, trade name, coined word or combination from the Dealer's trade or firm name.

(b)  **Other Use.** Without the prior consent of the Company, the Dealer shall not use any trademark, trade name, coined word of combination described in this Paragraph 20 in connection with any business conducted by the Dealer other than dealing in PRODUCTS to which any such trademark, trade name, coined word or combination refers, and (if used in a manner and form approved by the Company) dealing in used equipment.

(c)  **Goodwill and Reputation.** The Dealer shall not in any trading title used by the Dealer in connection with its business activities under this agreement or in connection with any other business activity, use any name or words capable of damaging the goodwill or reputation of the Company or any of its affiliates. The Dealer promptly shall carry out all reasonable instructions and requests of the Company issued to protect and promote the value, goodwill and reputation of any trademark or trade name to which the Company or any of its affiliates is entitled.

## 21. TERMINATION

(a)  **At Will.** The Dealer may terminate this agreement at any time at will by giving the Company at least 30 days prior notice.

(b)  **Replacement Agreement.** The Company may terminate this agreement at any time by giving the Dealer at least 30 days prior notice in the event the Company offers a new or amended form of agreement to its authorized dealers in PRODUCTS.

(c)  **Breach.** In the event that a party has failed to fulfill any of that party's responsibilities under this agreement, the other party may terminate this agreement by giving 30 days prior written notice. The terminating party shall give the other party a reasonable opportunity to cure any failure prior to giving notice of termination based upon that failure.

(d)  **With Immediate Effect.** The Company may terminate this agreement with immediate effect by giving notice to the Dealer or to the Dealer's legal representative in any of the following events:

(i)  Any transfer or attempted transfer by the Dealer of any interest in, or right, privilege, or obligation under, this agreement, or any transfer by operation of law or otherwise of the principal assets of the Dealer that are required for the conduct of its business under this agreement, or any change, however accomplished, in the direct or indirect ownership or operating management of the Dealer as set forth in Schedule A, without the Company's prior consent.

(ii)  Any misrepresentation in applying for appointment as an authorized dealer in PRODUCTS by the Dealer or any person named in Schedule A; the submission by the Dealer to the Company or any SOURCE of a false or fraudulent application or claim or statement in support thereof for warranty, policy or campaign adjustments or for wholesale parts or sales incentives or for any other refund, credit, rebate, incentive, allowance, discount, reimbursement or payment under any program, or the acceptance by the Dealer or any payment for any work not performed by the Dealer in accordance with the provisions of this agreement or the MANUAL.

(iii)  Failure of the Dealer for any reason to function in the ordinary course of business or to maintain the Dealer's place or places of business open for business for a period of at least seven consecutive days.

(iv)  Conviction in a court of original jurisdiction of the Dealer or any person named in Schedule A for any violation of law, or any conduct by any such person unbecoming a reputable businessman, or disagreement between or among any persons named in Schedule A that in the Company's opinion tends to affect adversely the operation or business of the Dealer or the good name, goodwill or reputation of PRODUCTS, the Dealer, the Company, any SOURCE or other authorized dealers in PRODUCTS.

- 7 -

(v)   Failure of the Dealer to fulfill any provision of Paragraph 7 or Paragraph 20 or to pay the Company or any SOURCE any sum due under any agreement between the Company or the SOURCE and the Dealer.

(vi)   The Dealer's failing to obtain or ceasing to hold any license required for the performance of any of the Dealer's obligations under this agreement.

(vii)   Death or physical or mental incapacity or disappearance of the Dealer, if the Dealer is an individual, or of the principal owner of the Dealer if the Dealer is a legal entity other than an individual; provided, however, that at the request of the executor or representative of a deceased or incapacitated owner and upon a showing of the ability to carry out the obligations of this agreement, the Company may defer the effective date of termination for a period of up to one year.

## 22. OBLIGATIONS UPON TERMINATION

Upon the termination of this agreement, the Dealer shall cease to be an authorized dealer in PRODUCTS, all orders from the Dealer for PRODUCTS that have not been shipped shall be cancelled without liability to either party, and the Dealer promptly shall (i) pay the Company and the appropriate SOURCE all sums owed by the Dealer to the Company and the SOURCE, (ii) remove all signs owned or controlled by the Dealer that bear any trademark or trade name of the Company or any of its affiliates, (iii) discontinue the use of stationery, sales literature and any other document bearing any trademark or trade name of the Company or any of its affiliates and (iv) cease to represent in any way that the Dealer is or was an authorized Dealer in PRODUCTS. If the Dealer fails to comply with these requirements, the Company may take reasonable steps to achieve compliance or the same result as would be realized by Dealer compliance (including entering the Dealer's premises to remove signs), and the Dealer shall reimburse the Company for all costs and expenses incurred by the Company in effecting or enforcing compliance.

## 23. ACQUISITION OF CERTAIN PROPERTY UPON TERMINATION

Unless otherwise provided by law, the following provisions shall control:

(a)   If this agreement is terminated by the Dealer under Paragraph 21(a) or 21(c), the Dealer may require the Company to acquire each new, unused, unsold and undamaged PRODUCT in the Dealer's stock on the date of termination provided the PRODUCT (i) is in first-class salable condition, (ii) is listed in the appropriate SOURCE'S then current price and data book or parts price list and (iii) was purchased from the SOURCE. The price for any reacquired EQUIPMENT shall be the price paid by the Dealer to the SOURCE, less charges for distribution, delivery, handling, advertising and taxes, and less any amount previously credited or refunded to the Dealer on that EQUIPMENT. The price for any reacquired GENUINE PART shall be 90% of the current dealer price, less all allowances and discounts paid or allowances and discounts currently offered by the appropriate SOURCE and less the amount representing the freight currently being prepaid by the SOURCE on stock orders. The Dealer must notify the Company in writing within 30 days of termination of this agreement that the Dealer is exercising its right to have the Company reacquire certain PRODUCTS.

(b)   If this agreement is terminated by either party for any reason, the Company may acquire from the Dealer any or all the PRODUCTS described in Paragraph 23(a) and any or all the PRODUCTS and other products not described in Paragraph 23(a) that were purchased by the Dealer from the SOURCES. The price for PRODUCTS described in Paragraph 23(a) shall be determined in accordance with that paragraph; the price for other PRODUCTS and other products shall be negotiated by the Company and the Dealer. If the parties cannot agree the price for the PRODUCTS and other products, the matter shall be submitted to binding arbitration in accordance with the Michigan Arbitration Act (M.C.L.A. §§ 5001-5035), as amended and in effect at the time of the dispute. The Company will notify the Dealer in writing within 30 days of termination of this agreement that the Company is exercising its right to acquire certain PRODUCTS and certain other products the Dealer purchased from the SOURCES.

(c)   Upon termination of this agreement, the Company may retake without payment any products and materials (such as sales promotion, advertising and training materials, tools and signs) provided to the Dealer by the Company or the SOURCES without charge. In no event, however, shall the Company have the obligation to purchase the Dealer's facilities (including land, buildings and equipment).

(d)   All items to be reacquired by the Company under this Paragraph 23 shall be packed, boxed or crated and shipped in accordance with Company instructions freight prepaid at the Dealer's expense to the destination specified by the Company, shall be delivered, sold and paid for free of all claims, liens and other encumbrances after compliance with all bulk sales or similar laws for the protection of creditors and shall be transferred by warranty bills of sale satisfactory to the Company. Upon the Dealer's signing and delivering a general release to the Company in a form satisfactory to the Company, the Dealer will be paid for the items reacquired by the Company, less any amount owed to the Company and the SOURCES.

## 24. RELATIONS AFTER TERMINATION

Any business relations between the Company or the SOURCES and the Dealer after termination of this agreement, whether with respect to PRODUCTS or otherwise, shall not constitute a waiver of the termination of this agreement or in any manner reinstate the contractual relationship that existed by virtue of this agreement, and all such relations shall be governed by terms identical to the relevant provisions of this agreement unless the parties execute a new agreement superseding this agreement.

## 25. NEW AGREEMENT

Unless otherwise specified by the Company in writing, the termination of this agreement by the Company in connection with the offer by the Company to the Dealer (or the Dealer's successor in interest) of a new agreement for one or more PRODUCTS shall not give rise to the rights and obligations provided in Paragraph 23 with respect to the PRODUCTS covered by the new agreement.

## 26. LIMITATION OF LIABILITY

This agreement contemplates that the Dealer, as an independent businessman, shall make all investments in the dealership and shall purchase and resell PRODUCTS in conformity with the provisions of this agreement, but otherwise in the Dealer's own discretion. Nothing in this agreement shall impose any liability on the Company or any SOURCE in connection with the Dealer's operations under this agreement or otherwise, or for any expenditure made or incurred by the Dealer in preparation for performance or in performance of the Dealer's responsibilities under this agreement.

## 27. AGENCY OR EMPLOYMENT RELATIONSHIP

This agreement does not create an agency or employment relationship between the Company or any SOURCE and the Dealer or any personnel of the Dealer. Neither the Dealer nor any personnel of the Dealer shall (i) be considered an agent or employee of the Company or any SOURCE, (ii) act or attempt to act or represent himself directly or by implication as an agent of the Company or any SOURCE of (iii) assume or create or attempt to assume or create an obligation on behalf of or in the name of the Company or any SOURCE.

## 28. ASSIGNMENT

Upon notice to the Dealer, the Company may assign this agreement and any rights and obligations under this agreement to any affiliate of the Company or to any company that succeeds to the interests of the Company.

## 29. APPLICABLE LAW

This agreement shall be governed by and interpreted in accordance with the laws of the State of Michigan.



**Ford New Holland, Inc.**

New Holland, Pennsylvania 17557

F N H
Jan 87  7562-A

Printed in the U S A

 **NEW HOLLAND**

**NEW HOLLAND NORTH AMERICA, INC.**

## DEALER AGREEMENT - SCHEDULE A

**Dealer Trade Name:** _____

**Dealer Address:** _____

(City, State and Zip Code)

### OWNER AND MANAGER

(i)   The Dealer conducts business under the following legal form:  **Corporation**

(ii)   Owners of the Dealer (individual(s) having a financial interest in the dealership):

| Name | Percent of Ownership |
|------|---------------------|
|      |                     |
|      |                     |
|      |                     |
|      |                     |
|      |                     |
|      |                     |
|      |                     |
|      |                     |
|      |                     |

(iii)   Person(s) responsible for the management of the Dealership:

| Name | Title |
|------|-------|
|      |       |
|      |       |
|      |       |
|      |       |
|      |       |
|      |       |
|      |       |

**Date:** _____

 **NEW HOLLAND**

**NEW HOLLAND NORTH AMERICA, INC.**

# DEALER AGREEMENT - SCHEDULE B

**Dealer Trade Name:** _____

**Dealer Address:** _____
                    (City, State and Zip Code)

## SOURCE OF EQUIPMENT

| SOURCE | PRODUCT LINE * |
|---|---|
| **NEW HOLLAND NORTH AMERICA, INC.** | ☐ Compact Tractors and Consumer Products |
| | ☐ 2-Wheel Drive Agricultural Tractors |
| | ☐ Bi-Directional Tractors |
| | ☐ 4-Wheel Drive Tractors |
| | ☐ Industrial Tractors |
| | ☐ Agricultural Equipment, including the full line of farm implements, twine and wire, but excluding combines and self-propelled forage harvesters |
| | ☐ Self-Propelled Forage Harvesters |
| | ☐ Combines |
| | ☐ Skid-Steer Loaders |

* Each PRODUCT LINE designated must be initialed by both the Dealer and the Company.

**New Holland North America, Inc.**

**By:** _____
                        Branch Manager

_____
                        Date



NEW HOLLAND NORTH AMERICA, INC.

# DEALER AGREEMENT - SCHEDULE C

Dealer Trade Name: _____

Dealer Address: _____

(City, State and Zip Code)

## DEALER LOCATION, INDUSTRY POTENTIAL AND PAR

### PRINCIPAL DEALER LOCATION (PHYSICAL LOCATION)

_____

(Street Address)

_____        _____        _____
(City)                             (State)                  (Zip Code)

### BRANCH LOCATION OF PRINCIPAL DEALER

_____

(Street Address)

_____        _____        _____
(City)                             (State)                  (Zip Code)

### PRIMARY AREA OF RESPONSIBILITY AND INDUSTRY POTENTIAL

The PAR shall mean the NON-EXCLUSIVE area designated below by the Company as the area of the Dealer's sales and service responsibility for PRODUCTS, which area may be different for different PRODUCT LINES. It is NON-EXCLUSIVE to Dealer.

The following chart identifies that portion (%) of the industry unit sales potential within the PAR that the Dealer is expected to participate in by PRODUCT LINES. The portion of industry unit sales potential just described will be reviewed periodically by New Holland and the Dealer will be advised of changes. This percentage, along with market share objectives and industry unit sales potential information, will be used to establish annual Dealer sales objectives.

### PRODUCT LINES AND % COUNTY ASSIGNMENT

| COMPACTS & CONS. PROD. | AG 2-WD | BI-DIR | 4-WD | INDL | AG. EQ. | SPFH | COMBINE | SSL | COUNTY | STATE |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

New Holland North America, Inc.

_____        _____
Branch Manager                                          Date



May 25, 2001

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Mr. William Curran, President
Atlantic Trading, Inc. d.b.a. Tractor-Tex
4500 N. Expressway 83
Brownsville, TX 78521

      RE:  Continued Misrepresentation

Dear Mr. Curran:

You have not responded to my letter of March 9, 2001, by complying with our demand that you cease all activities misleading the public into thinking you continue to have a relationship with New Holland.

This is our third and last letter demanding that you cease and desist all such activities.  If within the next twenty (20) days you have not returned to me the enclosed Agreement signed on your behalf and have not provided proof to me that you have removed all signs bearing the trademarks and/or tradenames of New Holland North America, Inc., changed or have instituted steps to change your corporate/business name to delete the words New Holland, Ford, Versatile, the New Holland Leaf Logo or any colorable imitation thereof, terminated all use of any trademarks or tradenames of New Holland North America, Inc., and ceased to represent to the public in any way that you are or were an authorized dealer of New Holland America, Inc., we will forthwith file the enclosed Complaint with the Federal District Court in Southern Texas.

We have repeatedly told you that this is a serious matter to our company and we will take the necessary actions, including the filing of this Complaint, initiating a civil law suit against you in Federal Court, to protect our proprietary rights.  I await your response within the next twenty days.

      Sincerely yours,

      *J. William Stader*

      J. William Stader
      Corporate Counsel

**New Holland North America, Inc.**

500 Diller Avenue
P O Box 1895
New Holland PA  17557-0903
Telephone (717) 355-1121



EXHIBIT
"B"

May 16, 2001

                              CERTIFIED MAIL
                              RETURN RECEIPT REQUESTED

Mr. William Curran
4500 N. Expressway 83
Brownsville, TX 78521

                    RE:  Continued Misrepresentation

Dear Mr. Curran:

You have not responded to my letter of March 9, 2001, by complying with our demand that you cease all activities misleading the public into thinking you continue to have a relationship with New Holland.

This is our third and last letter demanding that you cease and desist all such activities.  If within the next twenty (20) days you have not returned to me the enclosed Agreement signed on your behalf and have not provided proof to me that you have removed all signs bearing the trademarks and/or tradenames of New Holland North America, Inc., changed or have instituted steps to change your corporate/business name to delete the words New Holland, Ford, Versatile, the New Holland Leaf Logo or any colorable imitation thereof, terminated all use of any trademarks or tradenames of New Holland North America, Inc., and ceased to represent to the public in any way that you are or were an authorized dealer of New Holland America, Inc., we will forthwith file the enclosed Complaint with the Federal District Court in          .

We have repeatedly told you that this is a serious matter to our company and we will take the necessary actions, including the filing of this Complaint, initiating a civil law suit against you in Federal Court, to protect our proprietory rights.  I await your response within the next twenty days.

                              Sincerely yours,


                              J. William Stader
                              Corporate Counsel



March 9, 2001

CERTIFIED MAIL

Mr. William Curran
4500 N. Expressway 83
Brownsville, TX 78521

Re:  Continued Misrepresentation

Dear Mr. Curran:

Further to my letter of January 10, 2001, I understand that you are continuing to hold yourself
out as having a relationship with New Holland.  There is no relationship between you and New
Holland and it is highly inappropriate for you to continue this approach in the operation of your
business.  New Holland North America, Inc. demands that you immediately cease your activities
of misusing its trademarks and tradenames and of misrepresenting yourself to the public.

To facilitate your compliance with our demand, we would be willing to offer you a compromise
payment of $300.00 to remove your signs, stop advertising with the name of New Holland, and
cease any and all representations that you are an authorized dealer for New Holland North
America, Inc., subject to the following conditions:
    a)  You must provide me with proof that the sign has been removed, such as "before and
after" photographs, or the like;
    b)  You must sign and return to me the enclosed Settlement Agreement; and
    c)  Your compliance must occur within the thirty days immediately following the date of this
letter above, after which this offer will expire.

As I indicated in my letter, this is a serious matter to our company and we must demand that our
proprietary rights be protected.  I await your response within the next thirty days.

Sincerely yours,

*Bill Stader*

J. William Stader
Corporate Counsel

**New Holland North America, Inc.**

500 Diller Avenue
P O Box 1895
New Holland PA  17557-0903
Telephone (717) 355-1121

January 10, 2001

Mr. William Curran
4500 N. Expressway 83
Brownsville, TX 78521

Re:  Misrepresentation of Dealership

Dear Mr. Curran:

It has come to my attention that your farm equipment dealership is openly holding itself out as being associated with New Holland by the continued display of the New Holland sign.  Since your relationship with New Holland was terminated on April 30, 1999, you are not only in violation of the dealer agreement, but you are misusing our trademark and falsely advertising to the community.

This letter is a demand that you immediately cease the use of all NEW HOLLAND trademarks and trade names in signs, advertising, letterhead, websites, etc.  This is a serious matter to our company and we will protect our proprietary position.

Your prompt attention to this matter will save both of us money and aggravation.

Yours truly

/s/

J. William Stader
Corporate Patent Counsel

bcc:  S. Smith





EXHIBIT

"C"





CSlbPDF—www.fsxss.com








# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| NEW HOLLAND NORTH AMERICA, INC., | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | CIVIL ACTION |
| VS. | § | |
| | § | NO._____ |
| ATLANTIC TRADING, INC. d/b/a | § | |
| TRACTOR-TEX and WILLIAM CURRAN, | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## AFFIDAVIT IN SUPPORT OF ACCOUNT

| | |
|---|---|
| STATE OF PENNSYLVANIA | § |
| | § |
| _LANCASTER_ COUNTY | § |

BEFORE me, the undersigned notary public, on this date personally appeared, Mike Leisure, fully authorized representative and agent of New Holland North America, Inc., who under oath stated as follows:

1. My name is Mike Leisure. I am over eighteen (18) years of age and am legally competent to make this Affidavit, which is true and correct, is based upon my personal knowledge, and is made voluntarily and not under duress.

2. I am a fully authorized representative and agent of Plaintiff, New Holland North America, Inc., in the above-styled and numbered lawsuit.

3. A systematic record of Defendants, Atlantic Trading, Inc. d/b/a Tractor-Texas and William Curran's account has been kept by New Holland North America, Inc., with dates of sales, services, charges, and credits, together with the description of the item(s) provided and the charges and payments made.

4. The debt collection facts and claims set forth in the attached original complaint are within the personal knowledge of Affiant and are true and correct.

49380:980124.1:091701

**EXHIBIT**

"D"

5.     The true and correct balance on the account of Atlantic Trading, Inc. d/b/a Tractor-Texas and William Curran is $50,701.82, which sum is due and owing.

6.     All just and lawful offsets, payments and credits have been allowed and accounted for.

7.     Defendants have failed to make payment for the account balance which is just and due and now owing.

NEW HOLLAND NORTH AMERICA, INC.

By: _____

Printed Name: Mike Leisure

Title: Duly Authorized Representative and Agent for New Holland North America, Inc.

SWORN and SUBSCRIBED BEFORE ME on this 21st day of September, 2001.

_____
Notary Public, State of Pennsylvania

Notarial Seal
Barbara A. Weaver, Notary Public
Earl Twp., Lancaster County
My Commission Expires Nov. 15, 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| NEW HOLLAND NORTH AMERICA, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION |
| VS. | § | |
| | § | NO._____ |
| ATLANTIC TRADING, INC. d/b/a | § | |
| TRACTOR-TEX and WILLIAM CURRAN, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## TEMPORARY RESTRAINING ORDER

On September ____, 2001, this Court heard Plaintiff New Holland North America, Inc.'s application for temporary restraining order. A copy of Plaintiff's application for temporary restraining order was sent by Plaintiff to Defendant by facsimile prior to the entry of this order. This order is entered *ex parte* because if it is not immediately granted, Plaintiff will suffer irreparable injury, loss or damage before an evidentiary hearing can be held.

The Court has reviewed the application and has heard the argument of counsel. Based on the foregoing, the Court finds and concludes the following:

1.    If Defendants Atlantic Trading, Inc. d/b/a Tractor-Tex and William Curran continue representing to the general public that they are an authorized dealer of Plaintiff New Holland North America, Inc., by representing such by radio and/or television broadcasts and/or by displaying signs and/or advertising literature to advertise their business emblazoned with the trademark, trade names,

49380:980137.1:092101

trade dress, logos and/or designs of Plaintiff, namely, "Leaf New Holland," "New Holland," "Ford New Holland" and/or any colorable imitation thereof, then Plaintiff will suffer irreparable harm for which there is no adequate remedy at law. Plaintiff will likely prevail on the trial of its causes of action for trademark infringement, unfair competition, and breach of contract. Therefore, Plaintiff New Holland North America, Inc., is entitled to a temporary restraining order.

It is, therefore, ORDERED that Defendants Atlantic Trading, Inc. d/b/a Tractor-Tex and William Curran and their agents, employees, representative and anyone acting on their behalf are prohibited from or immediately required to do the following:

(1)   From using, in connection with the promotion, advertising or selling, leasing, renting and/or servicing farming equipment and services, the infringing marks, namely "Leaf New Holland," "Ford," "New Holland" and/or the designs associated therewith, or any colorable imitation or variation thereof, in connection with its business of sales and service of farm equipment, and the trade dress with which it is presented, the Plaintiff's trade dress and any other marks, names or other designations confusingly similar to Plaintiff's trademarks, trade names, and/or trade dress;

(b)   From otherwise competing unfairly with Plaintiff in any manner, including, but without limitation, (i) unlawfully adopting or infringing upon Plaintiff's marks, or (ii) adopting or using any other names, marks or designs that are confusingly similar to Plaintiff's marks or trade dress; and

(c)   From conspiring with, aiding, assisting or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a) and (b) above;

49380:980137.1:092101                                    -2-

(2)    That Defendants Atlantic Trading, Inc. d/b/a Tractor-Tex and William Curran, their agents, servants, employees, attorneys and all those persons in active concert or participation with any of them, including, but not limited to, their licensees and franchisees, to ***immediately remove*** and deliver up for destruction, or show proof of destruction of, any and all products, labels, signs, prints, packages, wrappers, receptacles and advertisements, and any other materials in their possession or control, that depict the names or marks "Leaf New Holland," "Ford," "New Holland" and/or the designs associated therewith, or any other mark confusingly or substantially similar to Plaintiff's marks and/or trade dress, and any materials or articles used for making or reproducing the same.

This temporary restraining order shall continue in effect until the expiration of 14 days from the signing, unless within the 14 day period, for good cause shown, this temporary restraining order is extended for a like period, or unless defendants consent to extend this temporary restraining order for a like period, or longer.

The Clerk of the court shall, on the filing of the required Bond by Plaintiff New Holland North America, Inc., issue a Temporary Restraining Order in conformity with the laws and terms of this Order.  This Order shall not be effective unless and until Plaintiff New Holland North America, Inc., files with the Clerk a certified check made payable to the District Clerk in the amount of $_____ or executes and files with the Clerk a Bond, in conformity with the law, in the amount of $_____ .

Defendants Atlantic Trading, Inc. d/b/a Tractor-Tex and William Curran shall appear before the _____ Brownsville Division of the Southern District of Texas in Cameron County, Texas at ____

o'clock __.m., on _____, 2001, then and there to show cause, if any they have, why a temporary injunction should not issue against them as requested by plaintiff. The Clerk of Court is hereby directed to issue a show cause notice to Defendants Atlantic Trading, Inc. d/b/a Tractor-Tex and William Curran to appear at the temporary injunction hearing.

      SIGNED on this ___ day of _____, 2001.


                                  _____

                                  JUDGE PRESIDING

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| NEW HOLLAND NORTH AMERICA, INC., | § | |
| | § | |
|     Plaintiff, | § | |
| | § | CIVIL ACTION |
| VS. | § | |
| | § | NO._____ |
| ATLANTIC TRADING, INC. d/b/a | § | |
| TRACTOR-TEX and WILLIAM CURRAN, | § | |
| | § | |
|     Defendants. | § | |
| | § | |

## ORDER

It is ORDERED that Defendants Atlantic Trading, Inc. d/b/a Tractor-Tex and William Curran

appear for temporary injunction before this Court on _____ at 9:00 a.m., to

show cause, if any, why a temporary injunction should not be issued as requested by Plaintiff New

Holland North America, Inc.  The Clerk of the Court is hereby directed to issue a show cause notice

to Defendants to appear at the temporary injunction hearing.

The Clerk shall, on the filing by Plaintiff New Holland North America, Inc., of the bond

required in the Temporary Restraining Order signed on _____ and on approving

the bond as required by law, issue a temporary restraining order in conformity with the law and the

terms of this Order.

SIGNED on this ___ day of _____, 2001.

_____
JUDGE PRESIDING